The judgment of the United States Customs Court is *affirmed*.

UNITED STATES *v.* F. B. VANDEGRIFT & CO. ET AL., KIMBLE GLASS Co. (No. 4183) [1]

[1] C. A. D. 42.

United States Court of Customs and Patent Appeals, March 6, 1939

*Webster J. Oliver*, Assistant Attorney General (*Joseph E. Weil*, special attorney, of counsel), for the United States.
*Lamb & Lerch* (*Thomas J. McKenna* of counsel) for appellees.

[Oral argument December 7, 1938, by Mr. Weil and Mr. Lerch]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Second Division, in reappraisements 110233–A and 110234–A.

Merchandise, consisting of three machines for use in the manufacture of glass ampoules, was exported from Germany during the months of October and November 1934, and imported into the United States at the port of Philadelphia during November and December of that year. The machines were entered by the importers at approximately $1,800 each.

Each machine was appraised by the local appraiser at 7,500 reichsmarks, its alleged foreign value, plus packing charges.

The importers appealed for reappraisement.

Considerable evidence was introduced by the parties.

In its first decision, the trial court, Sullivan, Judge, presiding, affirmed the appraised values.

On appeal, the appellate division of the Customs Court, in an opinion by Dallinger, Judge, held that the merchandise had no foreign, export, or United States value, that its dutiable value was the cost of production, and, accordingly, reversed the decision of the trial court and remanded the cause with instructions that the trial court find cost of production.

In his second decision, Judge Sullivan found that the cost of production of the involved machines was 4,369.45 reichsmarks each.

On appeal by the Government, the appellate division of the Customs Court, in an opinion by Dallinger, Judge, found from the evidence that the cost of production of each of the machines was 4,369.45 reichsmarks, as found by the trial court, and, accordingly, affirmed the trial court's judgment.

It appears from the record that one Jakob Dichter is the sole owner of the Ambeg Co., the German manufacturer of the involved machines; that the Kimble Glass Co. purchased the machines from the Ambeg Co. and paid therefor the sum of $1,800 per machine; that the Kimble Glass Co. also paid Jakob Dichter $1,200 per machine, which sum appellees contend was a license fee, but which counsel for the Government contend was a part of the purchase price of the machines.

The so-called license fee of $1,200 per machine was not referred to either on the invoices or on the entries, and it is contended here by counsel for the Government that it should have been included in both; that, as it did not appear on either, the importers failed to comply with the provisions of sections 481, 482, and 485 of the Tariff Act of 1930; and that, by virtue of the provisions of section 501 of that act, the appeals for reappraisement were invalid and should have been dismissed by the appellate division of the Customs Court.

Section 481, *supra*, provides that all invoices of merchandise imported into the United States shall set forth the purchase price of each item in the currency of purchase where the merchandise is "shipped in pursuance of a purchase or an agreement to purchase," all charges upon the merchandise, and any other facts deemed necessary to a proper appraisement, examination, classification of the merchandise, etc.

Section 482, *supra*, relates to certified invoices, etc.

Section 485, *supra*, relates to the form and contents of entries, and requires a declaration to the effect that the prices set forth in the invoices are the prices paid by the importer, etc.

Section 501, *supra*, provides, among other things, that—

No such appeal filed by the consignee or his agent shall be deemed valid, unless he has complied with all the provisions of this Act relating to the entry and appraisement of such merchandise.

If, as contended by counsel for the Government, instead of $1,800, as stated in the invoices and entries, the purchase price was $3,000 per machine, the invoices and entries are not in compliance with the provisions of sections 481, 482, and 485, *supra*, and, by virtue of the quoted provisions of section 501, the importers' appeals for reappraisement are invalid and should be dismissed.

The witness Herman Kleinberg Kimble, vice president and general manager of the Kimble Glass Co., testified that that company paid approximately $1,800 for each of the involved machines, and that it also paid an additional $1,200 per machine as a "license fee" for patent and exclusive selling rights in the United States. He stated positively that the payment of $1,200 per machine was not a part of its purchase price.

Under date of July 5, 1935, Treasury Representative John P. Griebel reported to the Treasury Department that—

\* \* \* The importer has the *exclusive rights to purchase these machines for export to the United States and also the exclusive rights to make, vend, and use the machines in the United States and Canada.* They will not be sold to any one else for export to the United States.

There is a written contract to this effect. It is a long document containing 21 paragraphs and there was no copy available, *a complete copy can be obtained from the importer.*

It gives Kimble rights for these and future patents in the United States and Canada and to make use and vend during the life of the agreements such processes, machinery, and articles. Also covers new patents and processes.

Kimble also agrees to pay Dichter (the manufacturer) certain so-called royalties, $5,000.00 in 1934, $6,000.00 in 1935, $7,000.00 in 1936, $8,000.00 in 1937, $9,000.00 in 1938, and $10,000.00 in 1939 and yearly thereafter.

*Mr. Dichter stated that this covers the right to use the patents of a number of different machines and processes already in use and all the new ones which he may bring out in the future. There are already quite a number of them for various machines and processes and all belong to Mr. Dichter.* [Italics ours.]

That report is identified in the record as Collective Exhibit 5.

No claim is made here that the "royalties" provided for in the written contract, referred to in the quoted excerpt, were a part of the purchase price of the involved machines. We quote further from Collective Exhibit 5:

*Prices.*—The only machine in question is the automatic ampoule machine, type U–1, *and the price is $1,800.00, ex-works, Berlin, Packing included.* [Except the word *"Prices,"* italics ours.]

\* \* \* \* \* \* \*

*Orders.*—Mr. Kimble [to whose testimony we have hereinbefore referred] was at the factory and placed the order for the three machines covered by the two consular invoices verbally.

The witness Kimble testified that the verbal contract for the purchase of the involved machines was entered into after the written contract, referred to in Collective Exhibit 5, was executed.

It appears from Collective Exhibit 7 (a report dated October 3, 1935, signed by Erwin G. May, Treasury attaché, and Horace A. Browne, Treasury representative) that the purchase of the involved machines was arranged orally with a representative of the Kimble Glass Co., and that Mr. Dichter, sole owner of the Ambeg Co., stated that—

The understanding was that *in addition to the purchase price of the machine itself,* there would be an "Abgabe" or payment of RM 3,000.00 [$1,200.00] per machine, accruing to Dichter as an individual, for the following reasons:

(1) The Universal ampoule making machines are excepted from that provision in the Kimble-Dichter contract which grants to Dichter a royalty of from 3% to 5% upon the proceeds of all products produced by his machines. Kimble, having acquired one Universal machine some years ago, did not wish to have this type of machine included in the royalty provision, as stated in paragraph 5 of the

.contract. This paragraph excepts such machines as are already in Kimble's possession. *Thus, Dichter had no continuing royalty rights* on the three Universal machines such as apply to other types. [Italics ours.]

Attached to another report (a report made by Erwin G. May, Treasury attaché, dated February 6, 1936, and appearing in the record as Collective Exhibit 11) is an affidavit of Jakob Dichter in which the following appears:

That he [Dichter] sold the machines [the three in question] to his American agent [the Kimble Glass Co.] in 1934 at a price of $1,800.00 per machine but that he received for each machine a total of $3,000.00, the difference being $1,200.00 license fee which Kimble agreed to pay on the machines ordered by him.

That before the above mentioned edict [issued by the German Government prohibiting the use of machines like those here involved in Germany] was published he freely offered and sold to all purchasers of these machines at a price no greater than the equivalent of $1,800.00 and if he were permitted by the government of Germany, he would have gladly sold in 1934 to all buyers at $1,800.00 or its equivalent.

That he has transferred all *patent rights in the ·United States and Canada to Kimble* and· for all of these considerations he has exacted a license fee as well as a royalty on the sale of the products of *some of the machines* he sells to Kimble *which matters he regards as wholly apart from the value or sales price of the machines themselves.* [Italics ours.]

There is no testimony in the record directly challenging the statements of the witnesses Kimble and Dichter that the sales price of each of the involved machines was $1,800, and that the additional sums of $1,200 per machine paid by the Kimble Glass Co. to Mr. Dichter were license fees, paid in consideration of the grant to the Kimble Glass Co., as stated by Mr. Kimble, of the patent rights and the exclusive selling rights in the United States, or, as stated by Mr. Dichter, of the patent rights in the United States and Canada.

It further appears from Collective Exhibit 5 that the price of the involved machines was $1,800 each "ex-works, Berlin, Packing included," and that the Kimble Glass Co. not only has the exclusive right to purchase machines like those here involved for export to the United States, but also the exclusive right to manufacture, sell, and use such machines in the United States and Canada.

It is true, as claimed by counsel for the Government, that the witness Kimble testified in answer to a question on cross-examination that the license fees of $1,200 per machine were paid for the right to use the machines. If, however, all· of his testimony is considered, it clearly appears that the license fees were not paid for the right to use the machines in question.

If it appeared from the evidence of record that the importer paid $1,800 per machine, plus $1,200 per machine for the right to their use, we would be compelled to hold that, as the right to use is one of the elements of ownership (*Billings* v. *United States*, 232 U. S. 261, 280), the so-called license fees were a part of the purchase price. It

appearing from the record, however, that the license fees were paid in consideration of the exclusive right to purchase the involved and like machines for export to the United States and the exclusive right to manufacture and sell machines like those here involved both in the United States and Canada, and that neither Mr. Dichter nor the Ambeg Co. was to receive royalties on the products produced by such machines, we conclude that there is substantial evidence of record to establish that the purchase price of the involved machines was $1,800 each, and that, as they were so invoiced and entered, the importers' appeals for reappraisement were valid.

The reports of the Government representatives were no doubt primarily intended to aid the customs officials' investigation of the facts relative to the purchase of the involved machines, and very properly contained theories and suggestions as to the possible motives of the foreign manufacturer and the Kimble Glass Co. Judicial determination, however, should be made on established facts, not theories. Accordingly, we have not accepted as statements of fact the theories advanced and the suggestions made in the reports of the Government representatives.

The next question requiring our consideration is whether the importers have established cost of production, as defined by section 402 (f) of the Tariff Act of 1930, which reads:

SEC. 402. VALUE.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(f) COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

Counsel for the Government contend that, although the importers established all of the general expenses of manufacture of the involved merchandise for a representative period, they failed to establish the *usual* general expenses required by section 402 (f) (2), *supra*. It is further contended by counsel for the Government that the 20 per centum addition for profit included in the cost of production estab-

lished by the importers is not in accordance with section 402 (f) (4), *supra*, because, it is claimed, the license fee of $1,200 per machine should have been included as a part of the Ambeg Co.'s profits.

In its decision, the appellate division of the Customs Court, among other things, said:

The evidence upon which they [the importers] rely consists of Exhibit 1 which is an affidavit of Jakob Dichter, the sole owner of the German firm which manufactured the machines in question, and the facts therein stated appear to be corroborated by special agents' reports offered in evidence by the Government and admitted as Exhibits 5 and 11. These facts may be summarized as follows:

(1) The cost of materials, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, amounts to 1,557.50 reichsmarks, or $623. This amount is then subdivided or broken down to show that 1,113.50 reichsmarks, or $445.40, is paid for wages, and 444 reichsmarks, or $177.60, is paid for materials.

(2) The usual general expenses, etc., are 193 per centum, which equals 2,048.95 reichsmarks, or $823.60.

(3) The cost of all containers and coverings, etc., is 35 reichsmarks, or $14.00.

(4) The addition for profit, etc., is 20 per centum or 728 reichsmarks, or $291.20.

The total cost of production, therefore, of each machine is 4,369.45 reichsmarks, or $1,751.50 [$1,751.80].

It would appear from the above summary that even if there had been no subdivision of the factors covered by the above paragraph (1) there would still be sufficient evidence to warrant a finding by the trial Court of the cost of production of the involved merchandise in accordance with said section 402 (f). *Philipp Wirth et al.* v. *United States*, 23 C. C. P. A. 283, T. D. 48144. Moreover, no evidence has been introduced by the Government to contradict the plaintiff's proof as to the cost of production. On the contrary, the special agents' reports (Exhibits 5 and 11) appear to corroborate the plaintiff's evidence.

But counsel for the Government in their brief filed herein contend that the items of general expenses during the month immediately preceding November 17, 1934, were not the usual general expenses as contemplated by the statute, and that the addition for profit is not "equal to the profit which ordinarily is added, in the case of merchandise of the same general character * * * by manufacturers or producers in the country of manufacture or production which are engaged in the production or manufacture of merchandise of the same class or kind."

In the affidavit of Jakob Dichter (Collective Exhibit 1) occurs the following:

I, Jakob Dichter, furthermore, declare under oath and depose that I am fully acquainted with all those costs which are connected with the manufacture or production of these machines;

That the said costs are entered in the books which are kept under my personal supervision and that I know that the costs, which are compiled in the attached Annexes III and IV, which annexes are herewith also declared as an integral part of my sworn declaration, are correct in accordance with my knowledge.

*I furthermore declare that I alone manufacture machines of the general kind which were delivered by me to the Kimble Glass Company for the manufacture of glass articles* and that in connection with the manufacture of other special machines in general 15 to 20% is added to the manufacturing costs by way of profit. [Italics ours.]

On page 8 [page 74 of the record] of said affidavit 16 separate items are enumerated as comprising the 193 per centum of general and overhead expenses; and that, taken in conjunction with the statements on pages 9 and 10 [page 75 of the record] of said affidavit, can fairly be taken to mean the usual general expenses in the manufacture or production of one of these machines.

The court then quoted the following from our decision in the case of *United States* v. *Henry Maier,* 21 C. C. P. A. (Customs) 41, T. D. 46378:

There is evidence in the record that there was no "such or similar" merchandise sold in Germany, and it is conceded by both parties hereto that there was neither a foreign nor an export value of the merchandise here in question. In the report of said special agent there is included an exhibit which contains a statement from the managing director of the manufacturer of the merchandise here involved, to the effect that the manufacturer's general expense in producing these goods was 22.72 per centum of their material and labor cost. In these circumstances, we think this is some substantial evidence sustaining the finding of the lower court upon this point * * *;

and held that the importers had established cost of production in accordance with the provisions of section 402 (f), *supra;* that the cost of production of each of the involved machines was 4,369.45 reichsmarks and, accordingly, affirmed the judgment of the trial court.

We think the finding of the appellate division of the Customs Court that the importers had established the usual general expenses in accordance with section 402 (f), *supra,* is supported by some substantial evidence. *United States* v. *Henry Maier, supra.*

The only other issue requiring our consideration is the contention made by counsel for the Government that the license fee of $1,200 per machine should be included in the addition for profit provided for in section 402 (f), *supra.*

Section 402 (f), *supra,* provides that there shall be an addition for profit—

*equal to the profit which ordinarily is added,* in the case of merchandise of the *same general character* as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind. [Italics ours.]

It appears from the record that Jakob Dichter's Ambeg Co. is the only manufacturer in Germany of *machines like those here involved;* that manufacturers of other "special machines" in Germany ordinarily add 15 to 20 per centum for profit; and that the Ambeg Co., as stated by Mr. Dichter, also generally adds a profit of 20 per centum to the cost of production "of *the other machines* produced" by it [italics ours]. That statement by Mr. Dichter was evidently interpreted by the appellate division of the Customs Court to mean other machines *like those here involved.*

It appears from the affidavit of Jakob Dichter, Collective Exhibit 1, that the "special machines" manufactured in Germany by other manufacturers are not of the same "general kind" as those here involved. Whether Mr. Dichter's statement should be interpreted as meaning that those "special machines" are not of the "same general character" nor of the "same class or kind" as those here in-

volved is not of vital importance in this case, in view of the fact that the Ambeg Co. *also* generally *adds a profit of 20 per centum* to its production costs of machines like those here involved. Assuming, therefore, that machines of the same general character or of the same class or kind as those here involved are not manufactured by other manufacturers or producers in Germany, the profit ordinarily added by the Ambeg Co. on machines like those here involved may be properly considered in a determination of cost of production of the particular machines under consideration. *United States* v. *Henry Maier, supra.*

We are of opinion, therefore, that there is some substantial evidence to support the findings of the appellate division of the Customs Court. Accordingly, the judgment is *affirmed.*